316 So.2d 7 (1975)
Helen DELAUNE, Individually and on Behalf of Kirk Bardwell, Plaintiff-Appellant,
v.
David John DAVIS et al., Defendants-Appellees.
No. 10309.
Court of Appeal of Louisiana, First Circuit.
June 30, 1975.
*8 M. H. Gertler, New Orleans, for plaintiff-appellant.
Donald T. Phelps, Baton Rouge, and Richard C. Baldwin, New Orleans, for defendants-appellees.
Before SARTAIN, ELLIS and BARNETTE, JJ.
SARTAIN, Judge.
This a medical malpractice suit brought for the alleged wrongful death of Kirk Bardwell. Plaintiff is his mother, Mrs. Helen Delaune, and the defendants are Drs. David John Davis, Page Acree and their liability insurer, St. Paul Fire & Marine Insurance Company. The case was tried before a jury which returned a verdict for the defendants. It is from this judgment that plaintiff appeals. We affirm.
Kirk Bardwell (decedent) was twentytwo years of age when on January 30, 1972 he was involved in an automobile accident in Livingston Parish. He was taken to the Baton Rouge General Hospital where he was attended initially by Dr. J. Patin, a general surgeon. Initial x-rays revealed that decedent had sustained a fractured jaw, rib and sternum in addition to lacerations about the face and injuries to his teeth. Decedent remained in the Baton Rouge General Hospital until February 4, 1972 when he was discharged by Dr. Acree.
At the time of the accident decedent was a student at the University of Southwestern Louisiana and shortly after his discharge from the hospital he returned to Lafayette, Louisiana and the university. He continued *9 to complain of chest pains which he attributed to the fractured rib. However, when these pains persisted he went to Dr. Nicholas Olivier. Dr. Olivier referred him to Dr. Lazard Klinger, a radiologist.
Dr. Klinger's x-rays revealed a soft tissue density in the region of the aortic knob which he considered indicative of an aneurysm of the aorta or "a so-called traumatic aneurysm secondary to injury." Dr. Klinger recommended that decedent see a cardiovascular and thoracic specialist.
Decedent was then taken to his mother's home in Metairie, Louisiana. She had made prior arrangements for the services of Dr. Alton Ochsner. Initially he was admitted to East Jefferson Hospital but when Dr. Ochsner also suspected an aneurysm of the aorta he transferred him to the Methodist Hospital in New Orleans. This was on March 24, 1972. Decedent was immediately prepared for surgery during the course of which the aorta burst resulting in uncontrollable hemorrhaging causing his death.
The aorta is the large vessel that carries all blood from the heart. An aneurysm occurs when there is a weakening of a blood vessel. The blood is contained in the tissue surrounding the vessel. It was described in layman's terms as a "balooning out". If there is an immediate rupture of the vessel there is generally instant death by bleeding.
The law is well settled that a physician owes a duty to his patient to exercise the degree of skill ordinarily employed under similar circumstances by members of his profession in good standing in the same community or locality and to use reasonable care and diligence along with his best judgment in the application of his skill to the case. Meyer v. St. Paul Mercury Indemnity Co., 225 La. 618, 73 So.2d 781 (1953).
The burden of proof rests with the plaintiff to establish that a physician deviated from the required standard of care employed by other physicians practicing in the same locality and under similar circumstances. Meyer, above. We are satisfied that the jury was properly instructed as to the law in cases such as this and that their verdict was in accordance with a clear preponderance of the evidence.
Plaintiff, however, contends to the contrary and very strenuously argues that Drs. Davis and Acree failed to exercise the degree of skill and care as the circumstances of this particular case dictate. Principally, plaintiff urges: (1) that during decedent's stay in the hospital an aortogram should have been performed as a diagnostic tool to determine whether decedent in fact sustained an aortic aneurysm; (2) that the defendants should not have released decedent from the hospital when they did; (3) should have advised decedent of the possibility that he might have sustained an aneurysm of the aorta; and (4) that the defendant doctors were guilty of malpractice in failing to provide adequate follow-up procedure subsequent to decedent's discharge from the hospital.
The medical evidence in this record is uniform to the effect that when an x-ray indicates widening of the mediastinum there exists the possibility of a traumatic aneurysm. The mediastinum is defined as the space in the chest between the pleural sacs of the lungs. It is internal bleeding which causes this area to widen. The causes for such bleeding are numerous.
Drs. Davis and Acree are medical associates limiting their practice to cardiovascular and thoracic surgery.
Dr. Davis was called by Dr. Patin to treat the decedent for the latter's chest injuries. When Dr. Davis arrived at the Baton Rouge General Hospital x-rays of the decedent's chest had already been taken. He examined these x-rays and considered the possibility of an aortic aneurysm. Inasmuch as the x-rays also disclosed fluid *10 in the chest cavity, the doctor inserted a tube to facilitate the draining of the fluid. After Dr. Davis was successful in stabilizing decedent's blood pressure, he placed him in the intensive care unit at the hospital as a precautionary measure. On January 31, after the doctor was satisfied that the decedent's condition remained stable, the decedent was transferred to a semi-private room. On February 1, 1972, Dr. Davis removed the chest tube. He last saw the decedent on February 2, 1972, when he turned the patient over to the care of his associate, Dr. Acree. Dr. Acree observed the decedent on February 3 and discharged him on February 4, 1972. Chest x-rays of the decedent were taken on each day of his confinement except the date of his discharge.
Dr. Davis testified that inasmuch as subsequent x-rays failed to show any further widening of the mediastinum his concern about the possibility of an aortic aneurysm subsided. X-rays on February 2, 1972 justified the removal of the chest tube and further indicated "no significant fluid noted in the chest." In response to question by plaintiff's counsel as to why he did not order an aortogram, Dr. Davis stated that inasmuch as subsequent x-rays revealed no widening of the mediastinum he did not consider it necessary.
Drs. Davis and Acree consulted each other as to decedent's progress so that when Dr. Davis left town on February 2, Dr. Acree felt he was sufficiently acquainted with decedent's condition to properly treat him. Dr. Acree stated that he relied upon the x-rays to basically rule out the probability of an aortic: aneurysm though the possibility did exist. He stated that on February 4, at the insistence of Bardwell, he sanctioned his release from the hospital but advised him to seek further medical attention. He was firm in his opinion that nothing in the x-rays justified subjecting the decedent to an aortogram.
An aortogram is a diagnostic technique performed under local anesthesia where a small incision is made over the femoral artery. A wire is inserted through a large needle. The needle is removed and a tube (catheter) is placed over the wire. With the wire supporting the tube, they are by means of fluoroscopic control directed through the vein to a position just beyond the spot where the aneurysm is suspected. Dye is injected through the tube into the area. The patient is then placed in an oblique position and x-rays are taken. The dye outlines the blood vessel thus indicating whether or not an aneurysm of that particular vessel exists. It is conceded that an aortogram is the best diagnostic procedure to use in indicating the existence of an aneurysm, but it has its hazards and should not be performed unless other clinical studies warrant its use.
Three radiologists testified, two for the plaintiff and one for the defendants. Their respective opinions are basically uniform. It is not unusual to observe a widening of the mediastinum following deceleration accidents such as the one in which decedent was involved. It is most unusual, however, for an aortic aneurysm to result. All three of these witnesses stated that when you observe a widening of the mediastinum you suspect the possibility of an aneurysm. It is just one of many factors to consider. The condition of the patient, his progress or lack of it, subsequent x-rays and other diagnostic procedures must be considered by the physician when he makes a judgment relative to the manner in which he chooses to treat his patient. Each of these witnesses examined for the benefit of the court and jury the x-rays taken of the decedent at the Baton Rouge General Hospital and each concluded that the x-ray of February 3, 1972 showed an overall improvement in decedent's condition with the mediastinum reverting to normal width. None of these witnesses could detect the aneurysm that subsequently developed. It is significant to us that each of these experts would have declined to recommend to the attending cardiovascular and thoracic surgeons that an aortogram be performed *11 on the decedent prior to his release from the hospital.
Three cardiovascular and thoracic surgeons testified, one for the defendants and two for the plaintiff. Their opinions are very similar with one exception, which we shall hereinafter note. They agree with the radiologists that initially the attending specialists should have considered the possibility of an aortic aneurysm because of the widening of the mediastinum. Further, an aneurysm of traumatic origin may not be immediately discernible and that one could manifest itself within two to eight weeks after the initial trauma. It is for this reason that medical follow-up be recommended and adhered to. They also considered the use of the aortogram as the best method for determining the existence of an aneurysm.
Dr. Charles A. Beskin, appearing for the defendants, and Dr. Alton Ochsner, called on behalf of the plaintiff, were both of the opinion that the condition of decedent on and particularly the x-rays of February 3, 1972, did not warrant resort to an aortogram.
Dr. Lawrence Strug was the only specialist who stated that he would have ordered an aortogram prior to releasing decedent from the hospital.
The record does not support plaintiff's contention that decedent was prematurely released from the hospital. He was most anxious to be released so that he could return to the university. His condition, other than the latent aneurysm, did not require that he remain hospitalized beyond February 4, 1972.
It was essential that decedent seek medical follow-up. The testimony reflects that it takes generally from two to eight weeks for the mediastinum to completely return to normal. While plaintiff seriously urges that her son was not given any advice to seek further medical attention, the jury resolved this issue in favor of Dr. Acree who stated that he definitely told Bardwell to select a doctor in Lafayette of the latter's choice and have that doctor call him.
Lastly, plaintiff urges that Dr. Acree departed from the standard of care imposed upon him in the instant matter by his failing to advise the decedent of the possibility that an aneurysm of the aorta might develop. Dr. Acree frankly conceded that he did not advise the decedent of this possibility. We do not believe that such an instruction under the circumstances and conditions mentioned above was necessary. The evidence is replete with testimony to the effect that such a possibility is very remote. Dr. Ochsner had seen only two other cases of traumatic aortic aneurysm in ten years of specialty in this field. He said they are "actually very rare." Dr. Klinger, whose firm directs the radiology department at the Lafayette General Hospital, could not recall ever having observed a traumatic aortic aneurysm in the many cases involving chest injuries that he had handled for the hospital. Dr. Lawrence A. Tujaque, a radiologist with the Baton Rouge General Hospital, stated that in his seven years' experience at the hospital he does not recall a single case of a traumatic aneurysm of the aorta. Dr. Beskin stated that having taken care of many patients with identical x-rays as those of the decedent for over a period of twenty-one years, he had not experienced "the misfortune of having such a situation develop."
Plaintiff contends that under the "informed consent doctrine" as expressed in Goodwin v. Aetna Casualty & Surety Co., 294 So.2d 618 (4th La.App., 1974), it was incumbent upon Dr. Acree to advise the decedent of such a possibility. We agree with the "informed consent doctrine" and concede that the same may by analogy be applied in the instant case if the facts so warranted. However, we do not believe that it is incumbent upon an attending physician to advise a patient as to every *12 conceivable possibility and eventuality that may stem from that physician's treatment. If the possibility is one that can be reasonably anticipated and falls within the expertise of the treating physician, then the treating physician should so inform his patient. However, relating the facts in the instant case to the application of this theory, we find the possibility of a traumatic aortic aneurysm to be so remote as to be beyond the realm of reasonable probability.
Further, the question of whether the decedent should have been informed of the possibility of an aortic aneurysm is directly related to the standard of care imposed on a treating physician. In this connection we note that not one of the specialists testified that defendants should have informed decedent of this possibility.
Accordingly, for the above reasons, the judgment of the district court is affirmed at appellant's costs.
Affirmed.