416 So.2d 619 (1982)
Phillip LaCAZE et ux., Plaintiffs-Appellants,
v.
L. R. COLLIER, M. D., Defendant-Appellee.
No. 14900.
Court of Appeal of Louisiana, Second Circuit.
June 15, 1982.
*620 Kennedy & Yeager by Charles J. Yeager, and Ralph W. Kennedy, Alexandria, for plaintiffs-appellants.
Provosty, Sadler & deLaunay by Frederick B. Alexius, Alexandria, for defendant-appellee.
Before PRICE, MARVIN and FRED W. JONES, Jr., JJ.
FRED W. JONES, Jr., Judge.
Plaintiffs, husband and wife, appeal a judgment rejecting their claim for damages in a medical malpractice action against the defendant physician, asserting several specifications of trial court error which raise the following substantial issues:
(1) Did the defendant physician fail to secure plaintiff wife's informed consent to the surgery in question because he did not advise her of all known risksspecifically the risks of vesico-vaginal fistula?
(2) Was the defendant physician negligent in failing to discover that plaintiff wife had a serious pre-operative infection and in failing to delay surgery until that infection could be properly treated in order to reduce the risk of a secondary wound infection?
Finding no manifest error in the trial judge's determination that the defendant physician secured the informed consent of plaintiff wife prior to surgery and agreeing with the trial judge that plaintiffs failed to prove by a preponderance of the evidence that the defendant physician was negligent in his medical treatment of plaintiff wife, we affirm.
Context Facts
In November 1972, plaintiff wife, Mrs. Doretha LaCaze, consulted Dr. L. R. Collier, defendant physician, a general surgeon practicing in Winnfield, complaining of pain in the lower abdomen and giving a history of chronic pelvic discomfort. Dr. Collier, whose practice involved considerable gynecological surgery, found that Mrs. LaCaze was suffering from a chronic pelvic inflammatory disease (P.I.D.). The physician prescribed antibiotic therapy and recommended a hysterectomy.
Between the initial visit in 1972 and May 10, 1977, Dr. Collier saw Mrs. LaCaze on about fifteen different occasions. On each of these examinations he noted that his patient continued to suffer from P.I.D. and the physician routinely repeated his recommendation that she undergo a hysterectomy. On May 10, 1977, Dr. Collier gave Mrs. *621 LaCaze a complete physical examination. He found that her uterus had increased in size and concluded that, in addition to P.I.D., she was also afflicted with either endometriosis (disease of internal menstruation) or uterine fibroids.
On June 11, 1977 Mrs. LaCaze became ill at her place of employment and fainted. That night she telephoned Dr. Collier and requested that he schedule her for a hysterectomy. Dr. Collier made the necessary arrangements for this surgery and Mrs. LaCaze was admitted to the Winnfield hospital on June 13, 1977. Upon admission, Mrs. LaCaze signed two separate forms consenting to the contemplated surgical procedure. Standard pre-operative tests indicated no abnormal physical condition. Dr. Collier, who had not examined Mrs. Collier after May 10, 1977, performed the hysterectomy on June 14, 1977.
During the course of the operation, Dr. Collier noted that his patient's uterus exuded a foul, coliform odor, indicating the existence of an active, severe infectious condition. Out of some 1500 hysterectomies he had performed, Dr. Collier could recall detecting an odor of this nature in only three or four. It was also discovered that Mrs. LaCaze's uterus was enlarged because of fibroids, but she did not have endometriosis.
During her post-operative stay in the hospital Mrs. LaCaze developed a secondary wound infection which was cleared up by Dr. Collier's treatment. Mrs. LaCaze also started experiencing difficulty controlling her urine flow, stating that it was "oozing from me and I didn't know what was causing it." She was discharged from the hospital on July 15, 1977.
In July 1977 Mrs. LaCaze returned to Dr. Collier for two post-operative examinations, complaining on each occasion of urinary problems and, specifically, of incontinence. On the second visit Dr. Collier became concerned that his patient might be suffering from a vesico-vaginal fistula,[1] and decided to arrange for her examination by a urologist. However, before he could do so, Mrs. LaCaze on her own initiative consulted Dr. E. C. St. Martin, a Shreveport urologist. Dr. St. Martin diagnosed the problem as a vesico-vaginal fistula and on August 23, 1977 performed surgery which corrected the condition.
At the trial on the merits, Dr. Collier conceded that Mrs. LaCaze developed the vesico-vaginal fistula as a result of the surgery he performed on June 14, 1977. However, plaintiffs do not contend that this constituted negligence on the physician's part.
Informed Consent
Appellants argue that, under the mandatory terms of R.S. 40:1299.40[2] (Louisiana *622 Uniform Consent Law), there can be no legal consent to surgery when the physician does does not warn the patient of the known risk of the loss of function of an organ. Consequently, they contend, here there was no legal consent given by Mrs. LaCaze because Dr. Collier did not warn her of the known risk of a vesico-vaginal fistula which would result in the loss of function of her bladder.
It is well established in our jurisprudence that the consent of a patient, express or implied, is required prior to a surgical procedure, and a surgeon who operates without such consent is liable in damages (even though not negligent in performing the surgery), except in case of an emergency requiring immediate surgery for preservation of life or health under circumstances in which it is impractical to obtain the consent of the patient or someone authorized to assume that responsibility. The patient's consent must be an informed one, i.e., the physician has a duty to disclose all known information material to a patient's intelligent decision to undergo a particular operation or therapeutic procedure. That information should include a description and explanation of the proposed diagnostic, therapeutic or surgical procedure contemplated, the material risks involved and any alternatives available. Babin v. St. Paul Fire & Marine Ins. Co., 385 So.2d 849 (La. App. 1st Cir. 1980); Steele v. St. Paul Fire & Marine Ins. Co., 371 So.2d 843 (La.App. 3rd Cir. 1979); Percle v. St. Paul Fire & Marine Ins. Co., 349 So.2d 1289 (La.App. 1st Cir. 1977).
It appears from our examination that the Uniform Consent Law upon which appellants rely deals primarily with evidentiary matters relating to written consents and, only incidentally, elaborates upon the jurisprudential rules governing informed consent by reciting specific "known risks." The statute does not purport to broaden the case law to extend the scope of required warning to all conceivable risks incidental to surgerya rule which would be patently unrealistic and unworkable.
Pretermitting consideration of whether an "abnormal communication" between the bladder and the vagina results in loss of function of an organ (the bladder) within the meaning of the Uniform Consent Law, we simply conclude that, in order to obtain Mrs. LaCaze's informed consent to the proposed hysterectomy, Dr. Collier was obliged under our law to warn her of all material risks. The factual question, resolved adversely to appellants by the trial judge, is whether there is a material risk of a vesico-vaginal fistula occurring incidental to a hysterectomy.
Dr. Vincent, an Alexandria obstretician and gynecologist, explained how these fistulae occur during a hysterectomy, as follows:
"I think there are basically three reasons why fistulae do result. One is direct injury at the time of surgery secondary to a scalpel, clamp, etc. which isor which would be unrecognized at that time. Secondly, you might have the inadvertent placement of a suture through the bladder connecting it to the vaginal cuff. And third would be the result of what we call a vascular necrosis where a certain particular area of the bladder would be devascularized or deprived of its blood supply, resulting in fistulae formation.
"A fistula forms primarily in all three ways because the area of the bladder itself is either directly left open or develops an opening due to necrosis of the tissue, and the bladder adheres and connects itself to the vagina."
He estimated that the rate of occurrence for vesico-vaginal fistulae is two or three per every thousand hysterectomies. Dr. Bowers, another Alexandria gynecologist, placed the rate at between three and five per thousand hysterectomies. Dr. Collier termed the risk as "very minor" in a total abdominal hysterectomy, occurring one or *623 two per thousand hysterectomies. Appellants made no attempt to refute this testimony relating to the risk of a vesico-vaginal fistula in the performance of a hysterectomy.
Considering this evidence, the trial judge was not clearly wrong in his factual finding that the risk of a vesico-vaginal fistula was not a material one in the performance of a hysterectomy. Consequently, Dr. Collier was not obligated to warn her of that risk and the failure to do so did not negate the existence of an informed consent to surgery. As the trial judge pointed out in his excellent, written opinion:
"There was no surgery without the lawful consent of plaintiff. According to her testimony, Dr. Collier recommended that a hysterectomy be performed on all 16 of her visits to him. They discussed the surgical procedures fully during that time and all material risks related thereto. Dr. Collier warned her there was a risk of problems and complications with all surgery. He told her that wound and cuff infections were the most common problem, that vaginal drainage for some time after surgery, bloody vaginal discharge for a shorter period after surgery, chest complications, illeus or bowel distention, blood clots and urinary infections also might occur. During the discussions prior to surgery, plaintiff asked about the effect of surgery on sex relations and requested that one ovary be saved, if possible. She was fully informed of all material risks and gave her consent to the surgery."
Since Dr. Collier secured the informed consent of Mrs. LaCaze prior to surgery, he was not negligent in this respect. This determination obviates the necessity of our discussing the question of causation, i.e., whether Mrs. LaCaze would have consented to surgery if she had been warned of the risk of a vesico-vaginal fistula. See Zeno v. Lincoln General Hospital, 404 So.2d 1337 (La.App.2d Cir. 1981).
Alleged Negligence in Failure to Detect Extensive Pre-operative Infection
La.R.S. 9:2794 details the burden of proof which must be discharged by a plaintiff in a malpractice action based on the alleged negligence of a physician.[3]
The question here is whether appellants proved by a preponderance of the evidence that Dr. Collier failed to use reasonable medical care and diligence because he did not examine Mrs. LaCaze upon her admission to the hospital for surgery, detect the presence of the extensive pelvic infection and delay surgery until that condition could be treated.
In dealing with this question, the trial judge stated:
"Could defendant have discovered the degree of active infection prior to surgery by a physical examination of plaintiff? That is the essential question posed by plaintiff's argument. There is no evidence that he could have. Here we have a doctor who had been treating Mrs. LaCaze regularly for several years. He had seen her 3 times in 1977 prior to surgery. On May 10, 1977, she had an extensive physical examination as well as a pelvic examination. Upon her entrance into the hospital and prior to surgery, laboratory *624 studies were done on defendant's orders. Urinalysis, hematology, BUN and electrolytes revealed nothing to indicate the presence of serious, extensive infections.
"Dr. Vincent, a specialist in obstetrics and gynecology, was the only expert witness who was asked about the failure to physically examine plaintiff prior to surgery and he did not consider that improper under the circumstances of the present case.
"Therefore, I conclude that plaintiff has failed to establish by a preponderance of the evidence that defendant failed to use reasonable care and diligence along with his best judgment in diagnosing any pelvic infection Mrs. LaCaze may have had prior to surgery."
Dr. Vincent explained that, if he had been acquainted with the patient's state of health over a period of four or five years (as was Dr. Collier), he would have no concern about performing the operation on June 14 without another physical examination after May 10, since he would not anticipate any major change during that period which would contraindicate the planned surgical procedure.
Appellants offered no evidence tending to show that reasonable medical care and diligence required Dr. Collier to give Mrs. LaCaze another physical examination, following that of May 10, after her admission to the hospital for the hysterectomy, or that such an examination (despite the extensive negative laboratory tests) would have revealed the presence of the widespread pelvic infection. Consequently, we agree with the trial judge that appellants failed to discharge their burden of proving that Dr. Collier was guilty of medical malpractice in this respect.
Decree
For the reasons set forth, we affirm the judgment of the district court, at appellants' cost.
NOTES
[1] Defined by medical witnesses as an abnormal communication between two cavitieshere, the bladder and vagina.
[2] This statute provides:

A. Notwithstanding any other law to the contrary, written consent to medical treatment means a consent in writing to any medical or surgical procedure or course of procedures which (a) sets forth in general terms the nature and purpose of the procedure or procedures, together with the known risks, if any, of death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, of disfiguring scars associated with such procedure or procedures, (b) acknowledges that such disclosure of information has been made and that all questions asked about the procedure or procedures have been answered in a satisfactory manner, and (c) is signed by the patient for whom the procedure is to be performed, or if the patient for any reason lacks legal capacity to consent by a person who has legal authority to consent on behalf of such patient in such circumstances. Such consent shall be presumed to be valid and effective, in the absence of proof that execution of the consent was induced by misrepresentation of material facts.
B. Except as provided in Subsection A of this Section, no evidence shall be admissible to modify or limit the authorization for performance of the procedure or procedures set forth in such written consent.
C. Where consent to medical treatment from a patient, or from a person authorized by law to consent to medical treatment for such patient, is secured other than in accordance with Subsection A above, the explanation to the patient or to the person consenting for such patient shall include the matters set forth in Paragraph (a) of Subsection A above, and an opportunity shall be afforded for asking questions concerning the procedures to be performed which shall be answered in a satisfactory manner. Such consent shall be valid and effective and is subject to proof according to the rules of evidence in ordinary cases.
[3] A. In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq., or a dentist licensed under R.S. 37:751 et seq., the plaintiff shall have the burden of proving:

(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians or dentists licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians or dentists within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill, and
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.