434 So.2d 1039 (1983)
Phillip LaCAZE et ux.
v.
L.R. COLLIER, M.D.
No. 82-C-1714.
Supreme Court of Louisiana.
June 17, 1983.
Concurring Opinion July 8, 1983.
*1040 Charles J. Yeager, Kennedy & Yeager, Alexandria, for applicant.
Frederick B. Alexius, R. Rae Swent, Provosty, Sadler & Delaunay, Alexandria, for respondent.
DIXON, Chief Justice.
Doretha R. LaCaze and her husband, Phillip R. LaCaze, sued her doctor, L.R. Collier, M.D., for damages resulting from complications arising after surgery. The case was tried before a judge who dismissed the plaintiffs' claims. The Court of Appeal, 416 So.2d 619, affirmed. We granted writs of certiorari. 420 So.2d 440 (La.1982).
The scope of the case is narrow. Though plaintiffs alleged in their petition that Dr. Collier negligently caused her complications, there was inadequate proof at trial that Dr. Collier fell below the standard of care required. This point was affirmed on appeal and has not been argued before this court. Neither is there any complaint with the surgery that was performed; Dr. Collier performed the operation that both he and the patient intended him to performa total hysterectomy. The issue before us is whether Dr. Collier made sufficient disclosures to Mrs. LaCaze prior to performing the surgery to obtain her informed consent to the operation.[1]
*1041 The essential facts are not in dispute. Mrs. LaCaze first consulted Dr. Collier in November, 1972, complaining of abdominal pain and giving a history of chronic pelvic discomfort. Dr. Collier made an initial diagnosis of pelvic inflammatory disease (P.I. D.), a general inflammation of the tissues and organs of the pelvic area due to inflammatory bacteria. He advised Mrs. LaCaze that she needed a hysterectomy and began antibiotic therapy.
Mrs. LaCaze continued to see Dr. Collier on a somewhat regular basis for the next five years, including approximately fifteen office visits. The diagnosis remained substantially unchanged and Dr. Collier continued to recommend the hysterectomy. On May 10, 1977 Mrs. LaCaze was given a complete physical examination, with Dr. Collier noting that the uterus had markedly enlarged in size possibly resulting from a fibroid condition or endometriosis (internal menstruation). Again, a total hysterectomy was recommended.
On Saturday, June 11, 1977 Mrs. LaCaze became ill at work and fainted. That evening she called Dr. Collier to schedule the hysterectomy, figuring "if I'm not going to get any better, I might as well have the surgery." Dr. Collier told her to report to the hospital; upon admission, Mrs. LaCaze signed two separate consent forms, neither of which gave any details of the surgery or related risks. Routine tests performed on June 13 revealed no abnormal conditions. Mrs. LaCaze had no fever. Dr. Collier had not seen her between the May 10 examination and the surgery performed on June 14.
Upon opening the abdomen, Dr. Collier and his scrub nurse noticed a foul, coliform odor. Of the fifteen hundred hysterectomies that he had performed, Dr. Collier testified that in only three or four cases had he seen such severe P.I.D. The operation was completed without incident with the removal of the uterus and both of Mrs. LaCaze's ovaries and fallopian tubes.
On the second postoperative day, Mrs. LaCaze developed a low grade temperature, and on the third, vibramycin was started. Dr. Collier noted "probable wound infection" on the fifth postoperative day, and on the sixth postoperative day, clear symptoms of a serious wound infection were evident. On June 24 the wound infection was treated by removing the sutures, draining the pus, and packing the wound. The wound was left open, with the coliform odor present, until July 12, when the wound was reclosed by Dr. Collier.
Meanwhile, on the tenth postoperative day, Mrs. LaCaze began having problems with her urine; she was not able to control her discharges. The nurses provided her with pads for the bed to absorb the leakage. Whenever she stood up, the urine flowed freely.
Mrs. LaCaze was discharged from the hospital on July 15, 1977. She saw Dr. Collier in two postoperative visits, each time complaining of urinary problems which had continued following her release from the hospital. Dr. Collier became concerned that she might have developed a vesico-vaginal fistula,[2] and made an appointment for her to see a urologist. Mrs. LaCaze failed to keep her third appointment with Dr. Collier, and he was unable to reach her by phone to advise her of the appointment with the urologist. In the meantime Mrs. LaCaze on her own initiative consulted Dr. St. Martin, a urologist, who diagnosed her condition as a vesico-vaginal fistula and performed surgery on August 23, 1977 which corrected the problem.
*1042 The only issue presented by appellants is whether Dr. Collier secured the informed consent of Mrs. LaCaze to the operation. Appellants rely on R.S. 40:1299.40, the Uniform Consent Law, arguing that its provisions create a duty on the part of the doctor to inform the patient of known risks included within the categories listed in the statute, in this case the loss or loss of function of an organ, and that a failure to meet this duty supports an action in negligence. Appellants also urge that the failure of Dr. Collier to meet with Mrs. LaCaze for a preoperative conference to answer questions concerning the procedures to be performed gives rise to an action in strict liability.
The Uniform Consent Law, by the preamble to Acts 1975, No. 529[3] and by its own terms, purports to define consent to medical treatment:
"A. Notwithstanding any other law to the contrary, written consent to medical treatment means a consent in writing to any medical or surgical procedure or course of procedures which (a) sets forth in general terms the nature and purpose of the procedure or procedures, together with the known risks, if any, of death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, of disfiguring scars associated with such procedure or procedures, (b) acknowledges that such disclosure of information has been made and that all questions asked about the procedure or procedures have been answered in a satisfactory manner, and (c) is signed by the patient for whom the procedure is to be performed, or if the patient for any reason lacks legal capacity to consent by a person who has legal authority to consent on behalf of such patient in such circumstances. Such consent shall be presumed to be valid and effective, in the absence of proof that execution of the consent was induced by misrepresentation of material facts.
B. Except as provided in Subsection A of this Section, no evidence shall be admissible to modify or limit the authorization for performance of the procedure or procedures set forth in such written consent.
C. Where consent to medical treatment from a patient, or from a person authorized by law to consent to medical treatment for such patient, is secured other than in accordance with Subsection A above, the explanation to the patient or to the person consenting for such patient shall include the matters set forth in Paragraph (a) of Subsection A above, and an opportunity shall be afforded for asking questions concerning the procedures to be performed which shall be answered in a satisfactory manner. Such consent shall be valid and effective and is subject to proof according to the rules of evidence in ordinary cases."[4]
The defendant contends that the Uniform Consent Law (which is not one of the "Uniform" statutes) as found by the Court of Appeal, is an evidentiary rule, and not a substantive change in the law. The defendant's argument is that the statute sets out procedures which, if followed, provide the physician with a presumption that a valid consent of the patient has been obtained, but that the failure to comply with the statute does not result in a cause of action for a patient against his doctor. The contention is that the statute may provide protection for a physician, but does not provide any rights to a patient; if the doctor chooses not to make use of the statute, then the *1043 question of whether the patient has consented to the procedures performed is to be answered by the rules developed in the jurisprudence.
The development of the doctrine of informed consent has not been a simple progression evident in the cases. Rather, the doctrine has pulled concepts from various sources and at times indicated various future directions. The two most influential sources of doctrine seem to have been the courts' awareness that the question of consent to medical treatment may be more than a simple question, and the development of an affirmative duty of a physician to disclose information to his patient.[5]
The rule is well established that a physician must obtain the patient's consent before he is legally entitled to commence treatment.[6] However, the courts were generally reluctant to find an absence of consent, relying instead on the rule that consent may be implied from the circumstances.[7] Thus, any action on the part of the patient, including silence, that was consistent with acceptance of treatment was found by the courts to be a valid consent.[8] More recently, the courts have begun to focus attention on the actions of the physician as well as the patient. In order for the patient's consent to be valid, the giving of the consent must be preceded by a certain degree of explanation by the physician about the proposed treatment.
The rule that a physician has a duty to make disclosures to his patient appears to have developed originally from court decisions examining the quality of the information that a physician did provide to his patient, either of his own violation or in response to patient questions.[9] While the physician was under no affirmative obligation of disclosure, fraudulent, deceptive, or misleading disclosures vititated the consent subsequently given.[10] Later cases relied upon the fiduciary relationship[11] between the doctor and patient and the common law belief that "[e]very human being of adult years and sound mind has a right to determine what shall be done with his own body"[12] to hold that a physician "was obligated to make a reasonable disclosure ... of the nature and probable consequences of the suggested or recommended ... treatment, *1044 and ... a reasonable disclosure of the dangers within his knowledge which were incident to, or possible in, the treatment he proposed to administer."[13]
In practice, the cause of action for informed consent became procedurally merged with the action for malpractice: both were treated as negligence actions.[14] The courts were reluctant to find a doctor liable for a battery where he performed the procedure for which the patient had given consent.[15] Furthermore, the complaint of the patient in an informed consent action was directed toward the failure of the physician to adequately disclose information related to the procedure, and not with the performance of the procedure itself. As a consequence of treating an informed consent cause of action as one in negligence, the plaintiff patient had to prove much more than an unauthorized touching; he had to show duty, breach of duty, causation and damages.
In defining the doctor's duty to disclose, many jurisdictions based the duty on the practices of physicians in the community, in keeping with traditional notions of malpractice.[16] Under this rule, a patient plaintiff would bear the burden of proving that *1045 the customary practice among physicians in the community favored disclosure of the information not disclosed by the defendant physician. Other jurisdictions, including our lower courts, rejected a formulation of duty based on medical custom and practice in favor of a duty recognizing the informational needs of the patient.[17] The patient's right to self-determination required that all information material to the patient's decision whether to undergo the proposed treatment must be disclosed in order that the patient may make an informed choice.[18] Material information was that which a reasonable patient[19] would consider important in making such a decision, including the nature and purpose of the proposed treatment and available alternatives, the likelihood of their success, the risks inherent in the procedure, and the prognosis if no treatment were administered.[20] Although in these jurisdictions the focus was again on the validity of the patient's consent rather than on the physician's conformity with medical custom and practice, the action continued to be treated as one in negligence.
In determining which risks need be disclosed to the patient, the courts in those jurisdictions have recognized the impracticality of informing the patient of all conceivable risks inherent in the procedure.[21] The benefit to the patient would not justify the demand on the doctor for such lengthy disclosure. Moreover, patients' choices could be less intelligent if the patient unreasonably refuses treatment fearing improbable consequences from unlikely risks. Instead, the courts have required that only *1046 the material risks be disclosed, with materiality being determined from the chance of occurrence of the risk and the severity of the consequence. Materiality is, in essence, the product of the risk and its chance of occurring. A severe consequence, ordinarily of interest to the patient, would not require disclosure if the chance of the consequence occurring was so remote as to be negligible. Likewise, no disclosure would be required of a very minor consequence even though the probability of Occurrence was high. At trial, once the severity and probability of the risk is presented, the trier of fact may determine materiality without the further aid of expert testimony.
Plaintiffs contend that the legislature has superseded the materiality standard by the enactment of the Uniform Consent Law. It is suggested that the legislature sought to redefine the physician's duty to disclose, replacing the jurisprudential rules with a statutorily defined disclosure requirement.
The written consent to medical treatment defined in Subsection A of R.S. 40:1299.40 does not purport to be exclusive. "Written consent" is defined: "Notwithstanding any other law to the contrary," and the consequences of compliance are stated. Subsection C, however, (added by Act 407 of 1976) seems to refer to all other forms of consent: "Where consent to medical treatment ... is secured other than in accordance with Subsection A above, the explanation to the patient ... shall include the matters set forth in Paragraph (a) of Subsection A above, ..." (Emphasis added). When there is an opportunity for questions, and satisfactory answers, Subsection C consents are valid and subject to ordinary methods of proof.
The addition of Subsection C the year after the first enactment of the "Uniform Consent" law discloses a legislative intent to define the exclusive methods of obtaining consent to treatment. It specifically defines a "written consent" which, if taken in compliance with the statute, is valid and effective. All other consents to treatment not taken in writing are valid and effective if the proof reveals that it "includes the matters set forth in Paragraph (a) of Subsection A ...," and opportunities are given for questions, satisfactorily answered.
Between the limits of Subsection A and Subsection C, all kinds of consents are included. There are either written consents defined in Subsection A, or those "secured other than in accordance with Subsection A above ..." The "consents" formerly permitted under the jurisprudence have been superseded by the statutes. (Consent is not required in emergencies. See R.S. 40:1299.54).
The initial phrase of the statute, "Notwithstanding any other law to the contrary..." is necessary because the requirements of the statute differ from the jurisprudential requirements for an informed consent. For example, the jurisprudence would require discussion of alternative treatments, which is omitted from the statute and, therefore, not necessary in a consent form which purports to comply with the statute. On the other hand, the statute is broader with respect to risks inherent in the proposed treatment. Under the materiality standard, both the severity of the consequence and the probability of occurrence are weighed by the physician; under the statutory rule, the consequences are listed, and the physician's requirement is to disclose all known risks of the listed consequences occurring, whether or not the probability of the occurrence is remote. No longer is the physician required to discuss with the patient alternatives to the proposed treatment. The "materiality" of the undisclosed risk, as such, need not be litigated.
R.S. 40:1299.40 has, therefore, superseded, in Louisiana, the jurisprudential rules defining "consent to medical treatment." A patient's consent to treatment must be measured by the standards contained in Subsection A or Subsection C of the statute.
Though Mrs. LaCaze signed two consent forms at the hospital, neither is urged as satisfying the requirements of the statute. The first, signed by the patient at *1047 2:50 p.m. on June 13, 1977, is essentially blank, containing only the names of the doctor and patient, the date and time, and the witness' signature. Though the form says that the possible complications of the "above-named treatment" were explained by Dr. Collier, the "above-named treatment" was never listed. The second form, signed at 5:00 p.m. the same day, consents to a total abdominal hysterectomy, but does not list any risks or acknowledge that any disclosures have been made or questions have been answered. Thus, neither form satisfies the requirements of Subsection A, and there is no presumption of validity of the consent. See Rogers v. Lumbermens Mutual Casualty Co., 119 So.2d 649, 652 (La.App.1960), where a bare bones consent to surgery was found "almost completely worthless."
Under Subsection C of the statute, a consent may be valid and effective, even if oral, if the disclosures listed in Subsection A are made and the patient is given an opportunity to have questions concerning the procedure satisfactorily answered. If, as the patient contends, there was no preoperative opportunity to ask questions concerning the procedure, then the physician would not have acquired consent under this subsection. In this case, however, the continuing relationship between Dr. Collier and Mrs. LaCaze, with the more or less constant discussions between them concerning her need for a hysterectomy and what the operation would entail provided sufficient opportunity for Mrs. LaCaze to ask all of her questions. The Subsection C requirement that the opportunity to ask questions be provided was met in this case.
Mrs. LaCaze knew that she would be put to sleep by anesthetic and that, while asleep, she would be cut open near her stomach. She fully understood that the operation would result in the removal of her uterus and other reproductive organs. She was aware that she would no longer have the capability to bear children, and had asked Dr. Collier to save one of her ovaries, if possible, to aid in hormone balance after the operation. The record supports the conclusion that Dr. Collier made full disclosure of the nature and purpose of the operation.
The second required disclosure is of the known risks, if any, of death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, and disfiguring scars. Plaintiff's uncontroverted testimony at trial was that Dr. Collier did not warn her of the possibility of a vesico-vaginal fistula forming, nor did he warn her in general terms of possible complications involving the bladder. From the evidence presented at trial, the risk that a fistula could occur in the procedure proposed by Dr. Collier (a hysterectomy) is clearly a known risk. Expert testimony estimated the chance of a fistula occurring at between two and five times out of one thousand operations. Dr. Collier's own experience at the time of trial was two fistulae in fifteen hundred hysterectomies. Dr. Collier testified that the vesico-vaginal fistula and how to avoid it were part of his medical education and training. While there may be risks so rare or remote that they would not be considered "known" risks under the statute, that is not the situation in this case.
The next question is whether the vesico-vaginal fistula is a "loss of function" of an organ. The trial court considered the question and concluded that the fistula was "only a temporary alteration of the function of the bladdernot a known loss of the use of an organ." This finding was in accord with the only medical evidence directly on point. However, whether the fistula resulted in the loss of function of an organ becomes a legal question, not a medical one, once the trial judge is given sufficient scientific, factual (not opinion) evidence to decide the issue.
The trial judge erred in not finding that the fistula caused a loss of function of the bladder. The function of the bladder is to act as a reservoir for urine until it is voided. A bladder which leaks no longer performs this function. The trial judge also concluded that there was only a "temporary" alteration *1048 of the function of the bladder. However, a fistula is only temporary in the sense that it can be corrected with surgery. It was stipulated at trial that a vesico-vaginal fistula will not heal itself through the natural processes of the body. Absent corrective surgery, the condition is permanent.
Since there was an undisclosed risk of loss of function of an organ, there was no consent obtained in accordance with the Uniform Consent Law.
Lack of valid consent gives rise to an action for damages. In Louisiana, however, only compensatory damages can be recovered. The defendant can only be cast for those damages caused by the breach of duty. This element, in the jurisprudence, has been referred to as the "causation" element. Not only must the plaintiff show that the undisclosed risk actually occurred, but the plaintiff must also prove that if the risk had been disclosed, the treatment and the unwanted consequences would have been avoided.[22] The plaintiff must prove that the failure to inform caused the damaging consequences. If the plaintiff would have undertaken the treatment in any event, in spite of the deficient "informed consent," there could be no recovery.[23]
Generally, courts adopting a patient-based standard of disclosure have also adopted an objective test for determining causation. Such a test seeks to determine whether a reasonable person in the patient's position would have consented to the operation if full disclosure had been made. While a subjective test may better protect the patient's right to self-determination, an objective test is consistent with a disclosure requirement based on the informational needs of a reasonable patient and what such a reasonable patient would consider important in making a decision. An objective standard to determine whether the patient, fully informed of the risks, would have undertaken the proposed treatment, is consistent with general tort law and relieves the physician from the dangers of aberrational decisions on the part of the patient.
Normally the question of causation is one for the trier of fact. In this case, neither the trial court nor the court of appeal reached the causation question since there was no duty found, and consequently, no breach. In determining causation, the finder of fact could consider the condition of the patient at the time of her decision and the necessity for the treatment. Also to be considered are the seriousness of the consequence not disclosed by the physician and the likelihood of the consequence occurring. The finder of fact could likewise consider what measures, if any, would be available for the correction of the consequence if it should occur.
This patient first began seeing Dr. Collier because of severe pain in her pelvis and back at the end of her menstrual cycle. She was in her thirties and had given birth to seven children from seven pregnancies. The doctor diagnosed chronic infection in her pelvic region and suspected several other problems from time to time. Antibiotics were prescribed and a hysterectomy was recommended on the first and each subsequent visit. The patient had had previous surgery in which her appendix had been removed, but the record does not indicate whether there were complications at that time. Her discomfort was lessened while taking the medicine prescribed for her, but *1049 increased when she went off the antibiotic treatment.
One Saturday the patient became ill at work and lost consciousness. That evening she phoned the doctor to make an appointment for surgery. Her doctor had repeatedly told her that the only way she would get better would be to have the surgery. She had discussed the proposed surgery several times in the years before making the appointment; she knew of the more common risks of surgery, and of this procedure in particular, from prior discussions. She was not told of a chance that a leak could develop in her bladder that could cause urine to flow freely from her vagina, nor that such a leak would require correction by subsequent surgery since it would not heal itself; nor that there might be a waiting period after the initial surgery to allow the patient to fully recover before operating again. In the event of such delay, the patient could wear pads to absorb the leakage or insert a cup which would direct the flow to a bag strapped to the leg. Mrs. LaCaze found the cup uncomfortable and used it only a few days.
The medical evidence in this record indicates the repair operation, though major surgery, is highly successful in correcting the problem. The doctor who corrected Mrs. LaCaze's fistula told her that she would be on the operating table from four to six hours. Following that operation, the patient was required to lie flat on her back for three weeks with tubes leading from both her abdomen and vagina to insure proper healing. Though she has now recovered from the fistula, Mrs. LaCaze testified that she feels no better than when she first entered the hospital for the hysterectomy. However, she is apparently suffering the effects of hormonal imbalance resulting from the removal of her ovaries.
It was apparently possible to live with the symptoms Mrs. LaCaze had experienced for over five years prior to the operation, though it does appear that her condition was slowly worsening and the P.I.D. was being controlled, but not eliminated.
Though the consequences of a fistula forming are severe, the chance of a fistula actually forming is quite small. While a one in two hundred (.5%) chance is something to be considered in deciding whether to undergo the operation, such a possibility of a complication occurring, where the complication could be subsequently corrected, should not be a determinative factor to a reasonable patient in Mrs. LaCaze's position.
Considering this patient's entire situation, plaintiffs have failed to meet the burden of proof as to causation.
The application of a subjective standard in this case would result in recovery by the patient. Mrs. LaCaze testified that she would not have consented to the surgery if she had known of the possibility of a fistula, since it would have meant more surgery. In this difficult area of deciding what might have been, the choice of a standard to apply in all cases will not be universally approved. If all decisions by the patient could be made on an intelligent basis; if all patients had sufficient scientific background and sufficient knowledge of the human body; if the decisions of all patients could be sufficiently free of the fear of the unknown, of superstitution and other extraneous influences upon the decision-making processes; if all patients were able to understand the physician and communicate with him; if the physician were not faced with these and various other impediments, doctor-patient accord would be a problem of manageable proportions.
The ultimate deciding factor seems to be that although the patient has the absolute right, for whatever reason, to prevent unauthorized intrusions and treatments, he can only recover damages for those intrusions, consent for which would have been reasonably withheld if the patient had been adequately informed. The physician ought not be cast in damages in a case in which it would have been unreasonable to withhold an informed consent for treatment.
The failure of plaintiff to meet this burden of proof of causation (that the damages were caused by the failure to obtain an informed consent) defeats her efforts to recover. A patient must meet the standard *1050 of reasonableness in order to recover damages. He cannot recover damages from treatment to which he had not consented if his withholding of consent should be unreasonable.
The judgments of the courts below are affirmed at plaintiffs' costs.
DENNIS, J., concurs with reasons.
BLANCHE, J., concurs and assigns reasons.
LEMMON, J., concurs.
BLANCHE, Justice (concurring).
The present case raises a single question: What effect did the passage of the Uniform Consent Law, La.R.S. 40:1299.40, have on the prior jurisprudential rules concerning informed consent?
The majority holds that the jurisprudential test of informed consent was superseded by the enactment of La.R.S. 40:1299.40, the Uniform Consent Law, which it concludes was created in order to describe the exclusive methods for obtaining consent to medical treatment in Louisiana. According to the majority, a physician must strictly comply with the disclosure requirements of the Uniform Consent Law, or face liability for the damages incurred by his patient. It is the opinion of this writer that such an interpretation misconstrues the nature of the action based on lack of informed consent and the intent and purpose of the Uniform Consent Law.
Prior to the enactment of the Uniform Consent Statute in 1975, the Courts of Appeal had developed a jurisprudential standard for determining whether a patient's consent to a particular course of medical treatment was informed. That standard, like the cause of action for lack of informed consent, was premised on the belief that people have the right to make major decisions about their bodies. Consistent with this belief, the jurisprudence imposed an affirmative duty on the physician to provide his patient with sufficient information to enable that patient to intelligently decide, by balancing probable risks against probable benefits, whether to undergo the proposed treatment, select an alternative process, or refuse treatment all together. Accordingly, the information typically required to be disclosed included the proposed diagnostic, therapeutic or surgical procedures contemplated, the material risks involved, and the alternatives available, if any. Percle v. St. Paul Fire & Marine Insurance Co., 349 So.2d 1289 (La.App. 1st Cir.1977).
In 1975, the legislature, by virtue of Acts 1975, No. 529 § 1, passed the Uniform Consent Statute, which, according to the preamble of that act, was designed to "define" consent to medical treatment. The act was created at the instigation of physicians who, in response to a tremendous increase in malpractice litigation, wished to secure the protection of a statute which if followed would assure that a valid consent had been obtained and thereby shield the physician from having to defend spurious suits. The act was clearly intended to provide physicians with the protection of an evidentiary rule creating a presumption of valid consent and was never intended to provide patients with a cause of action against their physicians for failure to strictly comply with the disclosure requirements of La.R.S. 40:1299.40. This much is evidenced from an examination of the statute as it first appeared in 1975. At that time the statute provided:
A. Notwithstanding any other law to the contrary, written consent to medical treatment means a consent in writing to any medical or surgical procedure or course of procedures which (a) sets forth in general terms the nature and purpose of the procedure or procedures, together with the known risks, if any, of death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, of disfiguring scars associated with such procedure or procedures, (b) acknowledges that such disclosure of information has been made and that all questions asked about the procedure or procedures have been answered in a satisfactory manner, and (c) is signed by the patient for whom the procedure is to be performed, or if the patient for any reason lacks legal capacity to consent by a *1051 person who has legal authority to consent on behalf of such patient in such circumstances. Such consent shall be presumed to be valid and effective, in the absence of proof that execution of the consent was induced by misrepresentation of material facts.
B. Except as provided in Subsection A of this Section, no evidence shall be admissible to modify or limit the authorization for performance of the procedure or procedures set forth in such written consent.
By its express terms, La.R.S. 40:1299.40 A merely describes what "written consent" means and states the consequences of compliance therewith: the patient's consent "shall be presumed to be valid and effective, in the absence of proof that execution of the consent was induced by misrepresentation of material facts." Obviously, the written consent to medical treatment defined in Subsection A of La.R.S. 40:1299.40 does not purport to be exclusive. La. R.S. 40:1299.40 B is intended to be read in conjunction with Subsection A. That subsection prohibits the admission of parol testimony to vary the terms of the written consent.
When read together, it is apparent that La.R.S. 40:1299.40 A and B are rules of evidence. They do not purport to confer substantive rights nor do they purport to be the exclusive means for obtaining a valid consent. Far from overruling the body of jurisprudence which had arisen prior to the enactment of the Uniform Consent Law, the statutory rules leave room for the jurisprudential rules to apply to those cases in which the presumptive consent has not been obtained pursuant to statute.
In 1976, pursuant to Acts 1976 No. 407 § 1, the legislature amended La.R.S. 40:1299.40 to add Subsection C. As stated in the preamble to that act, Subsection C was created "to provide for the requirements for oral consent to medical treatment." Obviously, the amendment was designed to extend the evidentiary presumptions of La.R.S. 40:1299.40 A to situations in which written consent could not be obtained and oral consent was necessary. It was evidently felt that physicians should not be denied the protection of the newly created evidentiary presumptions simply because a patient was physically unable to give written consent. La.R.S. 40:1299.40 C provides:
C. Where consent to medical treatment from a patient, or from a person authorized by law to consent to medical treatment for such patient, is secured other than in accordance with Subsection A above, the explanation to the patient or to the person consenting for such patient shall include the matters set forth in Paragraph (a) of Subsection A above, and an opportunity shall be afforded for asking questions concerning the procedures to be performed which shall be answered in a satisfactory manner. Such consent shall be valid and effective and is subject to proof according to the rules of evidence in ordinary cases.
Contrary to the majority interpretation, the following language in Subsection C: "Where consent to medical treatment ... is secured other than in accordance with Subsection A above," is not exclusive. That language, as evidenced the preamble to Acts 1976, No. 407 § 1, was simply intended to address those situations in which physicians wished to avail themselves of the protection of the evidentiary presumption of Subsection A but were unable to do so because they could not obtain the patient's written consent. Subsection C does not alter the evidentiary nature of the Uniform Consent Law.
In short, the majority's position that the Uniform Consent Law supersedes the prior jurisprudence on informed consent is simply not supported by a careful reading of the statute. The jurisprudence is superseded only in the sense that now a valid consent may be obtained "notwithstanding" the jurisprudence. The opposite is not true, i.e. that an invalid consent is obtained if the statute is not complied with. By its express provisions, the Uniform Consent Law deals only with valid consents, not invalid ones. There is nothing in the statute to indicate that compliance with the statute is the exclusive means of obtaining a valid consent. For example, the Uniform Consent Law *1052 does not deal with emergency situations in which consent is implied by law, yet there is no doubt that the doctor in such a situation would not be liable to the patient for failure to comply with the statute. The same is true with respect to the "therapeutic privilege" which has long been recognized and applied in the jurisprudence of Louisiana. See Percle, supra.
Accordingly, it is this writer's opinion that the Uniform Consent Law is an evidentiary rule that sets out procedures which, if followed, provide the physician with a presumption that a valid consent has been obtained. Should the physician fail to comply with the evidentiary requirements of the Uniform Consent Law, a valid consent may nevertheless be obtained under the rules developed by the jurisprudence.
In the present case, since there was an undisclosed risk of the loss of function of an organ (the bladder), there was no consent obtained in accordance with the Uniform Consent Law. Consequently, the question of whether the plaintiff had consented to the procedures performed must be answered by the rules developed in the jurisprudence. Properly stated the question becomes: Did the defendant inform the plaintiff of all material risks involved in the proposed procedure? Both the district court and the Court of Appeal concluded that the risk of a vesico-vaginal fistula forming was not a material one. Given the fact that a vesico-vaginal fistula was estimated to result in only .5% of the cases, that it is not life-threatening, and that it is easily repaired, it does not appear that the lower courts erred in determining that the risk of a vesico-vaginal fistula occurring was not a material one. Accordingly, the defendant was under no duty to warn Mrs. LaCaze of the remote possibility of such a fistula forming.
I respectfully concur.
NOTES
[1] Consent to medical procedures has developed both in the common law and in Louisiana jurisprudence along two distinct lines: lack of consent and lack of informed consent. Where a patient does not consent to surgery the doctor may be liable, even if good results are obtained. With the routine use of consent forms most modern cases concerning lack of consent deal with treatment beyond the scope of the consent given or with the existence of an emergency situation (where consent is implied). See Coppage v. Gamble, 324 So.2d 21 (La.App.1975), writ denied, 325 So.2d 819 (La.1976); Carroll v. Chapman, 139 So.2d 61 (La.App.1962). When consent to treatment is given by the patient, but the patient does not have sufficient information to make an informed decision concerning his treatment, the doctor may be liable in negligence for bad results obtained. Hodge v. Lafayette General Hospital, 399 So.2d 744 (La. App.1981); Percle v. St. Paul Fire & Marine Insurance Co., 349 So.2d 1289 (La.App.1977), writ denied, 350 So.2d 1218 (La.1977).
[2] A fistula is an abnormal opening between two organs of the body, in this case between the bladder and the vagina. Medical evidence presented indicated that the usual cause of a vesico-vaginal fistula forming is a stitch that may be inadvertently taken into the bladder during the closing of the vaginal cuff. In time, the stitch would pull through the bladder wall. Other possible causes are nicking the bladder with the knife or damaging the blood supply to a portion of the bladder wall with a blunt instrument or clamp. Vesico-vaginal fistulae typically measure only a few millimeters in size, and, once formed, retain their initial size until corrected.
[3] "To amend Title 40 of the Louisiana Revised Statutes of 1950 by adding thereto a new Part to be designated as Part XX thereof and consisting of Section 1299.40, relative to consent to medical treatment, to define such consent, and otherwise generally and specifically to provide with respect thereto." Acts 1975, No. 529.
[4] Subsections A and B were created by Acts 1975, No. 529 § 1. Subsection C was added by Acts 1976, No. 407 § 1, with the following preamble:

"To amend Section 1299.40 of Title 40 of the Louisiana Revised Statutes of 1950, by adding thereto a new Subsection to be designated Subsection C thereof relating to consent to medical treatment, to provide for the requirements for oral consent to medical treatment and otherwise to provide with respect thereto."
[5] See Meisel, The Expansion of Liability for Medical Accidents: From Negligence to Strict Liability by Way of Informed Consent, 56 Neb. L.Rev. 51, 74-86 (1977); Victor, Informed Consent, Medical Trial Technique Quarterly, 1981 Annual, 138, 139-141 (1981).
[6] Theodore v. Ellis, 141 La. 709, 75 So. 655 (1917). In Meisel, supra note 5, the rule is traced to the 18th century case of Slater v. Baker & Stapleton, 95 Eng.Rep. 860, 862 (K.B. 1767), where the court stated:

"[I]t appears from the evidence of the surgeons that it was improper to disunite the callous without consent; this is the usage and law of surgeons: then it was ignorance and unskilfulness in that very particular, to do contrary to the rule of the profession, what no surgeon ought to have done ..."
From the court's language, it is clear that it was already the physicians' established practice to obtain consent to treatment. See also Babin v. St. Paul Fire & Marine Insurance Co., 385 So.2d 849 (La.App.1980), writ denied, 386 So.2d 358 (La. 1980); Beck v. Lowell, 361 So.2d 245 (La.App. 1978), writ denied, 362 So.2d 802 (La. 1978).
[7] McGuire v. Rix, 118 Neb. 434, 225 N.W. 120, 123 (Neb. 1929); State v. Housekeeper, 70 Md. 162, 16 A. 382 (Md.1889); Kennedy v. Parrott, 243 N.C. 355, 90 S.E.2d 754 (N.C.1956).
[8] See Meisel, supra note 5 at 79.
[9] Meisel, supra note 5 at 80-81. Wall v. Brim, 138 F.2d 478, 479 n. 7 (5th Cir.1943); Hunt v. Bradshaw, 242 N.C. 517, 88 S.E.2d 762 (N.C. 1955).
[10] Nolan v. Kechijian, 75 R.I. 165, 64 A.2d 866 (R.I. 1949); Wall v. Brim, supra; Paulsen v. Gunderson, 218 Wis. 578, 260 N.W. 448 (Wis. 1935). See McCoid, The Care Required of Medical Practitioners, 12 Vand.L.Rev. 549, 586-590 (1959).
[11] In Natanson v. Kline, 186 Kan. 393, 403-404, 350 P.2d 1093 (1960), the court stated:

"The courts frequently state that the relation between the physician and his patient is a fiduciary one, and therefore the physician has an obligation to make a full and frank disclosure to the patient of all pertinent facts related to his illness...."
See also Victor, supra note 5 at 139.
[12] Schloendorff v. Society of New York Hospitals, 211 N.Y. 125, 105 N.E. 92, 93 (1914), opinion of Cardozo, J.
[13] Natanson v. Kline, supra 186 Kan. at 410, 350 P.2d 1093. In the case before the Kansas court there had been no disclosure by Dr. Kline concerning the proposed treatment (irradiation therapy). In denying rehearing, the court distinguished the situation where no disclosure is made from the situation where alleged inadequate disclosure is made. In the former, no expert testimony was needed, while in the latter, expert testimony was "required to establish whether such disclosures [were] in accordance with those which a reasonable medical practitioner would have made under the same or similar circumstances." Natanson v. Kline, 187 Kan. 186, 190, 354 P.2d 670 (1960), opinion denying rehearing.
[14] Whether negligence is the proper form of an informed consent action is not a settled question. Early decisions are analyzed in Cobbs v. Grant, 8 Cal.3d 229, 104 Cal.Rptr. 505, 502 P.2d 1, 7-8 (Cal.1972). Prosser has concluded the "prevailing view now is that the action ... is in reality for negligence in failing to conform to the proper standard." Prosser on Torts (4th ed. 1971), 165-166.

The choice may not be limited to either battery or negligence. See Halligan, "The Standard of Disclosure by Physicians to Patients: Competing Models of Informed Consent," 41 La.L.Rev. 1 (1980), wherein the author compares "technical battery," "professional negligence," "consumer fraud," and "fictional battery" models.
[15] In Natanson v. Kline, supra n. 11, 186 Kan. at 401-402, 350 P.2d 1093, the court stated:

"What appears to distinguish the case of the unauthorized surgery or treatment from traditional assault and battery cases is the fact that in almost all of the cases the physician is acting in relatively good faith for the benefit of the patient.... The traditional assault and battery involves a defendant who is acting for the most part out of malice or in a manner generally considered as `antisocial.' One who commits an assault and battery is not seeking to confer any benefit upon the one assaulted."
The court also found the fundamental distinction was that assault and battery is intentional, while negligence is unintentional. Id. See also Percle v. St. Paul Fire & Marine Insurance Co., supra at 1298, quoting Trogun v. Fructman, 58 Wis.2d 569, 207 N.W.2d 297 (Wis. 1973).
The Court of Appeal addressed the negligence/battery question directly in Hodge v. Lafayette General Hospital, supra, concluding that, at least as far as the Medical Malpractice Act, R.S. 40:1299.47 et seq., is concerned, an action for lack of informed consent is not an intentional tort, so presentation of the issue to a medical review panel was a prerequisite to bringing suit.
[16] The following, from Natanson v. Kline, supra n. 11, 186 Kan. at 409-410, 350 P.2d 1093, is representative of the rationale in medical community professional standard jurisdictions:

"... The duty of the physician to disclose, however, is limited to those disclosures which a reasonable medical practitioner would make under the same or similar circumstances. How the physician may best discharge his obligation to the patient in this difficult situation involves primarily a question of medical judgment. So long as the disclosure is sufficient to assure an informed consent, the physician's choice of plausible courses should not be called into question if it appears, all circumstances considered, that the physician was motivated only by the patient's best therapeutic interests and he proceeded as competent medical men would have done in a similar situation." (Emphasis added).
The trend in the law is away from a physician-based standard to a patient-based standard. See Rosoff, Informed Consent, 33-41 (1981), where the physician-based standard is termed the "old rule." Some state legislatures have mandated the retention of the physician-based standard. See Rosoff, supra at 75-231 for a state by state analysis.
[17] The influential decision of Canterbury v. Spence, 464 F.2d 772 (D.C.Cir.), cert. denied, 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972), challenged the theoretical underpinnings of the majority of jurisdictions' physician-based standard. The court reasoned that the decision on disclosure to the patient was primarily not a question of medical judgment, so the standards of medical custom and practice were inapplicable. Id. at 784-785.

"The duty to disclose, we have reasoned, arises from phenomena apart from medical custom and practice. The latter, we think, should no more establish the scope of the duty than its existence. Any definition of scope in terms purely of a professional standard is at odds with the patient's prerogative to decide on projected therapy himself. That prerogative, we have said, is at the very foundation of the duty to disclose, and both the patient's right to know and the physician's correlative obligation to tell him are diluted to the extent that its compass is dictated by the medical profession." Id. at 786.
[18] Canterbury v. Spence, supra at 786-787. There is no requirement that the patient be made to comprehend what is disclosed. See Capron, Informed Consent, 123 U.Pa.L.Rev. 340, 404-418 (1974); 39 Fed.Reg. 30649, refusing to amend guidelines on informed consent [45 C.F.R. § 46.3(c) 1974] to include a comprehension requirement since such a requirement would go beyond what the courts have demanded. See also, Meisel, supra note 5 at 113-123.
[19] In Canterbury v. Spence, supra at 787, the court reasoned:

"... Optimally for the patient, exposure of a risk would be mandatory whenever the patient would deem it significant to his decision, either singly or in combination with other risks. Such a requirement, however, would summon the physician to second-guess the patient, whose ideas on materiality could hardly be known to the physician. That would make an undue demand upon medical practitioners, whose conduct, like that of others, is to be measured in terms of reasonableness...."
See also Cooper v. Roberts, 220 Pa. Super. 260, 286 A.2d 647 (Pa.Super.1971).
[20] While not present in the case before us, we note that several states have acknowledged a physician's limited privilege to withhold information from a patient where the disclosure would have a detrimental effect on the patient's condition. Percle v. St. Paul Fire & Marine Insurance Co., supra at 1299. The physician in such instances makes a unilateral determination that, in his medical judgment, disclosure of a risk might, for example, preclude rational decision making on the patient's part due to emotional upset or create a chance of psychological damage to the patient. See Canterbury v. Spence, supra at 789. See also Meisel, supra note 5 at 99-107. A physician withholding information under such a therapeutic privilege could never have a valid consent under the Uniform Consent Law if the withheld risk was covered in the statute.
[21] Percle v. St. Paul Fire & Marine Insurance Co., supra at 1299; Delaune v. Davis, 316 So.2d 7 (La.App. 1975); Canterbury v. Spence, supra at 786-787; Cooper v. Roberts, supra 286 A.2d at 650; Salgo v. Leland Stanford, Jr. University Board of Trustees, 154 Cal.App.2d 560, 317 P.2d 170 (Cal.App. 1957).
[22] As explained in Canterbury v. Spence, supra at 790:

"... there must be a causal relationship between the physician's failure to adequately divulge and damage to the patient.
A causal connection exists when, but only when, disclosure of significant risks incidental to treatment would have resulted in a decision against it. The patient obviously has no complaint if he would have submitted to the therapy notwithstanding awareness that the risk was one of its perils."
[23] In Zeno v. Lincoln General Hospital, 404 So.2d 1337, 1343 (La.App.1981), the court skipped completely the duty issue and decided the case on causation alone. The court stated:

"... In this case because surgery was essential to avoid the possibility that the fistula would cause septicemia or cancer if it were not removed, a prudent person would have consented to the surgery upon being advised of these [undisclosed] risks...."