676 So.2d 602 (1996)
Milton C. LUGENBUHL, et al.
v.
Dr. James DOWLING, et al.
Wenonah Lugenbuhl, Wife of/and Milton C. LUGENBUHL, Jr., et al.
v.
James B. DOWLING, M.D., et al.
Nos. 95-CA-1557, 95-CA-1558.
Court of Appeal of Louisiana, Fourth Circuit.
May 15, 1996.
*603 J. Wayne Mumphrey, Law Offices of J. Wayne Mumphrey, Chalmette, for Plaintiffs/Appellees.
Stewart E. Niles, Jr., Patricia A. Bethancourt, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, L.L.P., New Orleans, for James Dowling.
Bruce J. Toppin, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, L.L.P., New Orleans, for Louisiana Patients' Compensation Fund.
Before SCHOTT, C.J., and PLOTKIN and WALTZER, JJ.
PLOTKIN, Judge.
In this appeal, we consider whether the jury erred in finding a physician liable for damages arising from a patient's subsequent herniation after the physician failed to use *604 the surgical mesh requested by the patient and agreed to by the physician. Finding that the record affords a reasonable basis for the jury's verdict on a theory of informed consent, we affirm the judgment.
Between 1963 and 1974, Mr. Milton C. Lugenbuhl Jr. suffered three failed inguinal hernia repairs until his surgeon, Dr. Vernon Kroll, used mesh in surgery in 1975. Approximately ten years later, Mr. Lugenbuhl developed an incisional hernia as a result of open heart surgery. Dr. James Dowling repaired the incisional hernia after Mr. Lugenbuhl signed a consent form which provided in part (emphasis corresponds to handwritten inserts):
1) I hereby authorize and consent to Dr. Dowling, M.D., and such supervising physicians, surgeons, assistants of his or her choice, to perform upon myself the following surgical, diagnostic, or medical procedure Repair incisional hernia with mesh including any necessary and advisable anesthesia.
2) I understand the nature and purpose of this procedure to be Repair Incisional Hernia with Mersilene Mesh

Mr. Lugenbuhl subsequently developed further herniation, which was repaired by Dr. Edward Foti. The Lugenbuhls contend that the subsequent herniation was caused by Dr. Dowling's failure to use mesh to repair the hernia in violation of Dr. Dowling's promise to use mesh.
The matter was referred to a medical review panel, which determined that Dr. Dowling did not fail to meet the applicable standard of care in treating Mr. Lugenbuhl. At the conclusion of the case, the trial judge granted Dr. Dowling's motion for a directed verdict on the issues of deviation from the standard of care and causation. This Court granted Mr. Lugenbuhl's application for supervisory writs and ordered that all issues be submitted to the jury. The jury found that Dr. Dowling failed to use reasonable care, that he failed to obtain informed consent, and that his fault was a cause of the injuries. The jury assessed fault at 90% to Dr. Dowling and 10% to Mr. Lugenbuhl, and awarded $300,000 to Mr. Lugenbuhl and $50,000 to Mrs. Lugenbuhl.
Dr. Dowling appeals assigning two errors: (1) that the plaintiffs failed to prove their case under either a theory of medical malpractice or informed consent and (2) that the jury's award is grossly excessive.
At trial, Mr. Lugenbuhl testified that because of his history of unsuccessful hernia repairs he strongly believed that mesh would be necessary. He repeatedly communicated his desire that mesh be used to Dr. Dowling who promised to use mesh. Dr. Dowling never told him that there was a possibility that mesh would not be used in surgery; if he had been told this, he would not have agreed to surgery. After surgery on November 4, 1988, he discovered that Dr. Dowling repaired his incisional hernia without mesh. After gallbladder surgery, this incisional hernia redeveloped and was ultimately repaired with mesh by Dr. Foti. Mr. Lugenbuhl was unable to work for two years during which time he was primarily bedridden and cared for by his wife. Mr. Lugenbuhl's testimony was corroborated by his wife and daughter.
In contrast, Dr. Dowling, who was accepted by the court as an expert in the field of general surgery, testified that he discussed mesh with Mr. Lugenbuhl only as a surgical option; he did not promise to use mesh and Mr. Lugenbuhl understood this. Dr. Dowling explained that the consent form simply authorized that mesh be used if he deemed it necessary in the exercise of medical judgment at the time of surgery. In fact, at the time of surgery he decided that the use of mesh would not be appropriate because of the small size of the hernia and the risk of infection. According to Dr. Dowling, he successfully repaired Mr. Lugenbuhl's incisional hernia, which never redeveloped. Dr. Dowling interpreted Dr. Foti's operative notes to mean that Dr. Foti's hernia repair was unrelated to the hernia that he repaired.
Dr. Foti, who was accepted by the court as an expert in the field of general surgery, testified that he first saw Mr. Lugenbuhl as a patient in May 1988. Mr. Lugenbuhl had developed a hernia which appeared from an examination of the surface to be three or four inches long but was revealed in surgery to be *605 six or seven inches long. He decided to use mesh to repair this hernia in advance of surgery under the circumstances of this case. However, he testified that ordinarily a surgeon would not agree in advance of surgery to repair a hernia with mesh. Therefore, he interpreted the consent form signed by Dr. Dowling and Mr. Lugenbuhl as only authorizing the use of mesh if necessary. When asked whether Dr. Dowling's hernia repair failed, Dr. Foti explained that when he operated on Mr. Lugenbuhl he found that Mr. Lugenbuhl had a large, complex defect in which it was not possible to distinguish the prior hernia repair by Dr. Dowling.
Ms. Pamela Schock R.N., Dr. Dowling's nurse at the time he treated Mr. Lugenbuhl, did not recall the circumstances of the signing of the consent form. She interpreted the form as authorizing the use of mesh if needed.
In his first assignment of error, Dr. Dowling contends that the Lugenbuhls failed to prove their case under either a theory of medical negligence or informed consent. Finding that the record affords a reasonable basis for the jury's verdict on a theory of informed consent, we do not consider whether the Lugenbuhls proved a case in medical negligence.
An appellate court should not disturb a finding of fact of a jury unless it is clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978). The reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973). The failure to obtain informed consent is the breach of a duty imposed by law rather than one determined by the medical specialty in which the physician practices. Steele v. St. Paul Fire & Marine Ins. Co., 371 So.2d 843, 848 (La.App. 3d Cir.), writ denied, 374 So.2d 658 (La. 1979). Expert testimony is not necessary to establish that a person in the plaintiff's position would attach significance to a particular risk. Smith v. Lincoln General Hosp., 27, 133, p. 8-9 (La.App. 2d Cir. 6/21/95), 658 So.2d 256, 263, writ denied, 95-1808 (La. 10/27/95), 662 So.2d 3.
Mr. Lugenbuhl testified that the incisional hernia that was repaired by Dr. Dowling without mesh reopened and was re-repaired by Dr. Foti with mesh. Dr. Dowling testified that the incisional hernia he repaired without mesh never reopened. Dr. Foti testified that because of the nature and extent of the defect he repaired, it was difficult to tell whether it encompassed Dr. Dowling's repair. Mr. Lugenbuhl and his family testified about their extensive efforts, which were reasonably based on Mr. Lugenbuhl's medical history, to ensure that mesh would be used in surgery by Dr. Dowling. Dr. Dowling denies that he promised to use mesh. Based on this information, the jury could conclude that Dr. Dowling failed to honor a promise to use mesh resulting in subsequent herniation in Mr. Lugenbuhl. Although other interpretations of the evidence may exist, after a review of the record we cannot say that the jury was clearly wrong.
In LaCaze v. Collier, 434 So.2d 1039, 1043 (La.1983) (footnote omitted), the Louisiana Supreme Court commented on the varied nature of the doctrine of informed consent:
The development of the doctrine of informed consent has not been a simple progression evident in the cases. Rather, the doctrine has pulled concepts from various sources and at times indicated various future directions. The two most influential sources of doctrine seem to have been the courts' awareness that the question of consent to medical treatment may be more than a simple question, and the development of an affirmative duty of a physician to disclose information to his patient.
The present case, although unusual, falls within the ambit of the theory of informed consent. In Hondroulis v. Schuhmacher, 553 So.2d 398, 414-14, 417 (La.1988), on rehearing, the Louisiana Supreme Court limited its holding in LaCaze, supra, to ground the informed consent doctrine firmly on the right to self-determination protected by a *606 constitutional right to privacy. In Hondroulis, supra at 412, however, the Louisiana Supreme Court, fearing self-interested testimony and hindsight, retained LaCaze's objective test:
Generally, courts adopting a patient-based standard of disclosure have also adopted an objective test for determining causation. Such a test seeks to determine whether a reasonable person in the patient's position would have consented to the operation if full disclosure had been made. While a subjective test may better protect the patient's right to self-determination, an objective test is consistent with a disclosure requirement based on the informational needs of a reasonable patient and what such a reasonable patient would consider important in making a decision. An objective standard to determine whether the patient, fully informed of the risks, would have undertaken the proposed treatment, is consistent with general tort law and relieves the physician from the dangers of aberrational decisions on the part of the patient.
LaCaze, supra at 1048. Subjective considerations, however, can bar recovery: if the patient would have consented regardless of the information given, then he cannot complain that he wasn't sufficiently informed to consent. See, e.g., Bourgeois v. McDonald, 622 So.2d 684, 689 (La.App. 4th Cir.), writ denied, 629 So.2d 1177 (La.1993). Under unusual circumstances, a patient's subjective expectations can also play a significant role in establishing a lack of informed consent. See, e.g., Hartman v. D'Ambrosia, 95-0393, p. 7-8 (La.App. 4th Cir. 11/30/95), 665 So.2d 1206, 1209-10, writ denied, 95-3124 (La. 2/16/96), 667 So.2d 1060.
At first glance, Dr. Dowling's failure to honor his promise to use mesh might appear to sound more in contract or even fraud than tort. In this case, however, what Mr. Lugenbuhl was deprived of was his right to self-determination in his medical treatment. When Mr. Lugenbuhl communicated his strong desire that mesh be used, assuming that desire wasn't wholly irrational, the risk that mesh would not be used became material and Dr. Dowling should have disclosed before surgery that during surgery he might, through the exercise of medical judgment, reevaluate the need for mesh. Mr. Lugenbuhl would then have been free to find another surgeon or to go ahead with the procedure with a better understanding of the risks.
In his second assignment of error, Dr. Dowling contends that the jury's award is grossly excessive. The discretion vested in the trier of fact in the award of general damages is so great, even vast, that an appellate court should rarely disturb an award. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess under the particular circumstances should an appellate court increase or reduce an award. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). The award appealed is not obviously the result of passion or prejudice. Although many rational triers of fact could have decided that a lower award was appropriate, we cannot conclude from a review of the record that this is one of those exceptional cases where such an award is so gross as to be contrary to right reason. This assignment of error is without merit.
Accordingly, the judgment in favor of the Lugenbuhls is affirmed.
AFFIRMED.
WALTZER, J., concurs with reasons.
SCHOTT, C.J., dissents.
WALTZER, Judge, concurring.
While I agree with the majority's analysis affirming the jury's finding of liability based on lack of informed consent, I write separately because I believe that plaintiffs proved their claim of medical malpractice.
There was evidence of record that the failure of the incision made by defendant, without the mesh required by the consent form, was causally related to the ultimate herniation. Dr. Foti saw Lugenbuhl 17 May 1988, on referral from Lugenbuhl's cardiologist, Dr. Rolston, for evaluation of a hernia of intra-abdominal wall and possible repair. Lugenbuhl told him he had several surgical procedures and as a consequence to these *607 various procedures had wound up with abdominal wall weakness which was uncomfortable. Dr. Vernon Kroll had done four hernia repairs on him in the past, three of which had failed. Lugenbuhl said mesh had been used, but Foti didn't know if it was used only the last time or was used several times. According to his recollection, Lugenbuhl told him mesh had not been used on any of the procedures Dr. Dowling had performed on him.
Lugenbuhl had a protrusion, a soft spot of his abdominal wall, about 3 or 4 inches, and he felt like part of his intestines were coming out through the hole (which was covered by skin). When he was taken to surgery, Dr. Foti used six to seven inches of mesh to substitute for normal tissue. The decision to use mesh was made at the office when he first spoke to Lugenbuhl. Foti operated on Lugenbuhl 13-14 months later because the surgery had not mended properly, and repaired it with sutures and mesh.
On cross-examination, Dr. Foti testified:
Q: When you performed your first surgery on the patient, did you reach an opinion to a reasonable medical probability that the hernia that you were working on arose from the gallbladder?
A: Yes.
Q: So the hernia that Dr. Dowling repaired, that is the medline defect that he repaired from the cardiac surgery, that, to a reasonable medical probability, was not the cause in which youon what you treated the patient for with regard to that subcostal abdominal herniation: is that correct?
A: Well, the best way I can tell you is that this hernia was large and extended into the area that they'all call itthe post-heart-surgery hernia was. And so I don't think anybody can tell you whether it was or it wasn't. It was all a very complex defect that had to all be repaired at the same time. * * * I think that it is impossible for anyone to say whether there werethe epigastric hernia, the first hernia, was part of the gallbladder hernia or not. I mean, it's just all, all altogether at this time. * * * I think that the post-heart-surgery hernia and the post-gallbladder surgery hernia cannot be separated. It was one large, complex defect. And I don't think anybody can say that, you know, they were separate or they were together or what have you. And the whole area had to be repaired in order to keep it repaired.
Q: ... The question is the origin, that is, etiology. To a reasonable medical probability, is it your opinion that the etiological factor started with the subcostal gallbladder herniation and extended towards and later incorporated the epigastric hernia, that is the cardiac hernia?
* * * * * *
A: I think it is reasonable to say that the major hernia here started from the separation of the abdominal wall after the gallbladder surgery. (Emphasis supplied.)
While there was also testimony from Dr. Foti supporting the defense's position that the failure to use mesh did not violate the general standard of care in the medical community[1], I believe that the testimony *608 outlined hereinabove is adequate support for the jury's verdict under this state's manifest error standard.
When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court's finding, on review the appellate court should not disturb this factual finding in the absence of manifest error. Stated another way, the reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts. Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973).
We are instructed that before a fact-finder's verdict may be reversed, we must find from the record that a reasonable factual basis does not exist for the verdict, and that the record establishes the verdict is manifestly wrong. Lewis v. State through Dept. of Transp. and Development, 94-2370 (La. 4/21/95), 654 So.2d 311, 314; Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880 (La.1993). I am cognizant of this Court's constitutional duty to review facts[2], not merely to decide if we, as a reviewing court, would have found the facts differently, but to determine whether the trial court's verdict was manifestly erroneous, clearly wrong based on the evidence, or clearly without evidentiary support. Ambrose v. New Orleans Police Department Ambulance Service, 93-3099 (La. 7/5/94), 639 So.2d 216, 221; Ferrell v. Fireman's Fund Ins. Co., 94-1252 (La. 2/20/95), 650 So.2d 742, 745. In light of the evidence supporting a finding that the subsequent surgery was necessitated by the failure of Dr. Dowling's incision, which could have been obviated by the use of mesh, I believe that the record does not demonstrate that the jury verdict was manifestly erroneous.
I agree that plaintiffs proved a lack of informed consent to Dr. Dowling's meshless surgical procedure. A clear undertaking, underlined for emphasis, to use mesh in a consent form is, under the facts of this case, a precondition to Mr. Lugenbuhl's consent to the surgical procedure. Were the interpretation of the consent form suggested by the defense witnesses to be accepted as the law of this State, consent forms would be rendered essentially meaningless.
SCHOTT, Chief Judge, dissenting:
This is a medical malpractice case arising out of a hernia repair performed on plaintiff, Milton Lugenbuhl, by defendant, Dr. James Dowling. Plaintiff charged defendant with failing to use mesh instead of sutures and staples to close his surgical incision resulting in complications requiring further surgery and with failing to diagnose plaintiff's gall bladder problem resulting in the necessity of two surgeries instead of one. After a jury trial plaintiff recovered $300,000.00 in general damages and his wife recovered $50,000.00 for loss of consortium. Defendant has appealed. The principal issue is whether plaintiff carried the burden of proving medical malpractice under LSA-R.S. 9:2794 even though he produced no medical expert testimony.
Plaintiff was referred to defendant by his cardiologist for the surgical repair of a hernia that developed at the lower end of an incisional scar left from quadruple coronary bypass surgery performed in October 1985. Defendant first saw plaintiff in November 1987. Based upon a physical examination, the medical history supplied by the cardiologist, and plaintiff's complaints of bloatedness *609 and an uncomfortable feeling, defendant confirmed the presence of the incisional hernia and scheduled the surgical repair for December 4, 1987.
Plaintiff had an extensive history of inguinal hernia problems having surgery in 1963, 1964, 1974, and 1975 by Dr. Vernon Kroll. In this fourth surgery Dr. Kroll performed the hernia repair with mesh and he also removed one of plaintiff's testicles. Plaintiff's next surgery was the quadruple bypass surgery in October 1985 from which he later developed a hernia at the lower end of the heart incision.
When defendant examined plaintiff in November 1987, plaintiff's primary complaint was about the incisional hernia, but he also complained about a bloated and uncomfortable feeling. They discussed the fact that plaintiff had three failed inguinal hernia repairs and the fourth one repaired with mesh. According to plaintiff, he was convinced from his previous medical experience that mesh was absolutely required for this repair; he insisted that defendant use it, and defendant promised him he would. Plaintiff's testimony was corroborated by that of his wife and daughter. According to defendant, he made no such promise and never would. He said he would have told plaintiff to find another surgeon rather than make such a promise. Also according to plaintiff, defendant simply disregarded his complaints of being bloated and uncomfortable while defendant stated that he considered these complaints as consistent with the incisional hernia.
On November 30, 1987, plaintiff and defendant signed a standard form of authorization for and consent to surgery. The first and second paragraph were as follows:
1) I hereby authorize and consent to Dr. Dowling, M.D., and such supervising physicians, surgeons, assistants of his or her choice, to perform upon myself the following surgical, diagnostic, medical procedure Repair incisional hernia with Mesh including any necessary and advisable anesthesia.
2) I understand the nature and purpose of this procedure to be Repair Incisional Hernia with Mersilene Mesh [Emphasized words are handwritten inserts on a printed form].
According to plaintiff, after the operation defendant told him he didn't use mesh; he didn't like to use it, and the sutures he used would never come apart. Plaintiff's wife testified that she was shocked when told by defendant he had not used mesh after repeatedly telling her husband he would use it. According to defendant, after the surgery he told plaintiff's wife he did not have to use mesh and she did not express any displeasure about it. He denied saying he used some special sutures which would never fail.
In visits following the December 4 surgery, plaintiff seemed to be making a satisfactory recovery until January 14 when he complained of epigastric discomfort following meals and other symptoms of gallbladder disease. Following an ultrasound, defendant on January 21 diagnosed an inflamed gallbladder and recommended surgery for the removal of the gallbladder, a cholecystectomy. Defendant performed this surgery on January 25, 1988, and this time the consent form contained no reference to mesh. According to plaintiff, he did not insist on mesh this time because of defendant's assurances that the sutures he was using were as strong as mesh.
About a week after the cholecystectomy, plaintiff went to defendant's office for the removal of the staples. He testified that before he got there he had coughed and felt something pop inside of him. As defendant was removing the staples, the wound opened up (like a zipper in plaintiff's words) and his intestines were poking out. In plaintiff's version they were coming out of his body to the extent that defendant was trying to hold them in with his hands. Under defendant's version they protruded through the fascia, but remained under the skin. In any event plaintiff was readmitted to the hospital where defendant performed a surgical repair of this gallbladder wound evisceration on February 2. Plaintiff was making a satisfactory recovery until April when he developed still another hernia. This time he saw another surgeon, Dr. C. Edward Foti, who performed a surgical repair on May 30. This time mesh was used because the hole was large and it *610 was necessary to put in a substitute for the normal tissue. Although plaintiff was insistent on the use of mesh, Foti's decision to use it was based upon the fact that there was no alternative method available. Foti also performed a second surgery on plaintiff on July 26, 1989, to repair a drain site from the previous surgery. He again used mesh.
The only physician plaintiff called at trial other than defendant for cross examination was Dr. Foti. It is fair to say that he totally exonerated defendant. He found nothing in the consent form requiring the use of mesh; he thought the decision to use mesh was to be made by the surgeon alone; he found no reason for the use of mesh in the surgeries performed by defendant, and he gave clear and reasonable explanation as to why the use of mesh by defendant would have been inappropriate. Every physician who testified, including Foti, defendant, and the three who served on the Medical Review Panel, testified that defendant's conduct was consistent with the degree of knowledge and skill possessed by surgeons in the community and by those in defendant's specialty.
At the conclusion of the case and before it was given to the jury, the trial judge granted defendant's motion for a directed verdict, finding that plaintiff failed to satisfy his burden of proof as to the standard of care, a deviation from that standard, and causation. The judge reserved plaintiff's other claims for the jury. This court granted plaintiff's emergency application for supervisory writs, reversed the judgment of the trial court, and ordered that all issues be submitted to the jury.
The case was submitted to the jury on written interrogatories. The jury found that defendant either lacked the degree of knowledge or skill or failed to use reasonable care and diligence along with his best judgment in the medical care and treatment of plaintiff; he failed to obtain plaintiff's informed consent in treating him; and his fault was the cause of injuries sustained by plaintiff. The jury also found specifically that plaintiff did not "fail to use ordinary care under the circumstances for his own protection" and yet they attributed ten percent of the total fault to plaintiff.
This is a case where plaintiff called no expert to carry the burden of proof placed on him by R.S. 9:2794. However, he argues that such an expert was not necessary in this case pursuant to Pfiffner v. Correa, 643 So.2d 1228 (La.1994). In that case the court held that expert testimony is not required where they physician does an obviously careless act, such as fracturing a leg during an examination, amputating the wrong leg, dropping something on a patient, or leaving something in a person's body. This is so because a lay person can infer negligence from such conduct. Similarly, the court recognized that failure to provide timely treatment to the patient was the kind of conduct which would not necessarily require expert testimony to establish negligence. Plaintiff's case in Pfiffner involved the failure to render timely examination and treatment, but the court held that expert testimony was required to establish the causal connection between Mr. Pfiffner's death and the delay in his treatment. The court characterized this problem as one which involved "a complex medical condition ... beyond the province of lay persons to assess." Pfiffner at page 1234.
In this case plaintiff argues that the jury was capable of reaching three conclusions without the necessity of expert testimony: 1) defendant's failure to use mesh constituted negligence or malpractice; 2) defendant's failure to diagnose the gallbladder problem prior to the surgery to repair the hernia on the incisional scar left from the cardiac surgery constituted negligence or malpractice; and 3) all of plaintiff's surgeries after the first one performed by defendant along with his prolonged period of recovery were caused by defendant's failure to use mesh despite his promise to do so.
On the failure to use mesh, plaintiff simply argues that the jury could conclude this was negligence because the first three hernia repairs of Dr. Kroll done without mesh failed whereas the fourth done with mesh succeeded. Defendant's incisional repair, the gallbladder closing, and the repair of the wound evisceration done without mesh all failed while Foti's repair with mesh was successful. Plaintiff was able to convince the jury that *611 these procedures were all linked together because of their close proximity to one another in plaintiff's body and if sutures and staples failed and mesh worked mesh should have been used every time.
A reading of the testimony of every physician who appeared at this trial shows that the use of mesh to make surgical repairs or to close surgical incisions is the very kind of complex question which Pfiffner held requires expert testimony to answer. Mesh placed in one's body is a foreign substance which might be rejected and which raises the chances for infection. It sometimes causes fibrosis, scarring, and a painful incision. Dr. Foti, plaintiff's own witness, stated that it was not reasonable to use mesh for the repair of plaintiff's cardiac incision or the gallbladder surgery. Rejecting the notion that plaintiff's medical history demanded the use of mesh, Foti stated that its use depended on such criteria as the tissues look poor, they will not hold sutures, or the patient has some intra-abdominal problem such as carcinoma, ptosis or ascites. From Foti's testimony along with that of all the other physicians on this subject, we conclude that as a matter of law plaintiff was required to produce expert testimony that the failure to use mesh constituted malpractice.
The same conclusion follows with respect to the charge of malpractice against defendant for his failure to diagnose plaintiff's gallbladder problem before defendant performed the first surgery. Plaintiff was referred to defendant for a specific problem, the failure of the incision from the bypass surgery. When defendant examined plaintiff, he attributed the complaints of feeling bloated and uncomfortable with the incisional failure. Every physician who testified said this was a reasonable conclusion. No expert testified that these complaints warranted extensive testing for gallbladder problems. Under these circumstances, the law as interpreted by Pfiffner does not allow the jury to make the determination that defendant's conduct was substandard in this respect.
The final Pfiffner related question is whether the lay testimony was sufficient to prove that all of plaintiff's damages for which the jury awarded him $300,000 and his wife $50,000 were caused by defendant's breach of his promise to use mesh, assuming that he did. This brings us back to the threshold question as to the viability of plaintiff's claim based upon the alleged promise made to him by defendant to use mesh. Defendant argues that the consent form was valid based upon the testimony of all the physicians who appeared at trial. This testimony and the arguments about informed consent and breach of contract accomplish nothing but to obfuscate a very simple question.
The consent form itself is clear. The repair will be made with mesh. Defendant, Dr. Foti, and the other physicians seem to say these words either do not mean what they say or they are meaningless in any event. Their position seems to be that no matter what the words said, defendant could disregard them with impunity. This argument is meritless. Furthermore, defendant's position must be considered in light of the fact that the jury believed plaintiff, and his wife, and daughter that he unequivocally promised to use mesh. He didn't have to make this promise. As Dr. Foti said, he could have told plaintiff good-bye and let him find another surgeon. But he had no right to make the promise and disregard it when it was so important to plaintiff that he use mesh. Furthermore, it matters not whether plaintiff's insistence on the use of mesh was misguided or even foolish. He was entitled to his opinion and to rely on defendant's promise. The harder question is what damages did he suffer from this breach of promise. Plaintiff needed the surgery. He produced no evidence that any physician anywhere would have agreed to use mesh. Furthermore, he produced no evidence that the use of mesh would have prevented any of his subsequent surgeries or problems. In the final analysis, all he proved was that defendant performed an operation in an unauthorized manner but which was not only necessary but would have been performed sooner or later in the same way as defendant performed it anyway. Plaintiff is entitled to nominal damages for being deprived of the opportunity of determining this for himself and voluntarily subjecting himself to it. Defendant's wife is not entitled to damages for *612 loss of consortium. Consequently, I would substantially reduce plaintiff's award and dismiss his wife's claim for loss of consortium.
NOTES
[1] Q: ... Do you have an opinion, rather, to a reasonable medical probability as to whether or not Dr. Dowling complied with all prevailing standards of care as it relates to the second surgical procedure he performed on Mr. Lugenbuhl, the gallbladder surgery?

A: Yes.
Q: And what is that opinion?
A: I think he met the standards of care in the gallbladder surgery.
Q: Likewise, did you formulate an opinion as to whether or not Dr. Dowling complied with all prevailing standards of care in the third surgery he performed? That was the repair of the evisceration or the wound dehiscence associated with the gallbladder surgery.
A: Yes.
Q: What is that opinion, sir?
A: I think he met the standards of care when he repaired the evisceration of the gallbladder wound.
Q: Is it not more reasonably [sic] to a medical probability to apply mesh [given Lugenbuhl's history of tissue failure] as the safest avenue for treatment for this patient?
A: No. The reasons are that in order for mesh to help a patient in these circumstances, it has to be applied at the, on the layer closest to the abdominal cavity, risking intestinal adhesions, sinuses, fistulae. And the repair of a fresh, brand-new multilayer, right subcostal incision doesn't carry with it under normal circumstances that high a risk of hernia even in a patient who has had four inguinal hernia repairs and a drain site repair from his mediastinoscopy.
[2] See, LSA-Const. Art. 5, section 10(B).